**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE WILLIAM JAMES DEL
BIAGGIO, III,

*Debtor*,

LIQUIDATING TRUST
COMMITTEE OF THE DEL
BIAGGIO LIQUIDATING TRUST,
*Plaintiff-Appellee*,

v.

DAVID FREEMAN,
*Defendant-Appellant.*

No. 13-17500

D.C. No.
4:12-cv-06447-YGR

OPINION

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Submitted January 6, 2016[*]
San Francisco, California

Filed August 22, 2016

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

Before: Alex Kozinski, John T. Noonan,
and Diarmuid F. O'Scannlain, Circuit Judges.

Opinion by Judge O'Scannlain

**SUMMARY**[**]

**Bankruptcy**

Affirming the district court's affirmance of the bankruptcy court's summary judgment in an adversary proceeding, the panel held that an individual creditor's general unsecured fraud claim was properly subordinated to other claims senior or equal to it.

The panel held that the claim was properly subordinated under 11 U.S.C. § 510(b) because it was a damages claim arising from the purchase or sale of securities of an affiliate of the debtor. The panel held that the claim arose from the sale or purchase of securities in Predators Holdings, LLC, owner of Nashville Hockey Club Limited Partnership, LLC, which owned and operated the Nashville Predators National Hockey League team. The panel also held that § 510(b) is not limited to corporate debtors, but also applies to individual debtors.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Merle C. Meyers and Michele Thompson, Meyers Law Group, P.C., San Francisco, California, for Defendant-Appellant.

Michael M. Lauter, Michael H. Ahrens and Steven B. Sacks, Sheppard, Mullin, Richter & Hampton LLP, San Francisco, California, for Plaintiff-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

A provision of the Bankruptcy Code requires that damages claims arising from the purchase or sale of the security of a debtor be subordinated to other claims senior to or equal to it. We must decide whether such treatment applies where the debtor is an individual.

I

A

The Nashville Predators are a National Hockey League ("NHL") team in Nashville, Tennessee. As of 2007, the Predators were owned by Craig Leipold and his family. During that year, however, David Freeman learned that Leipold intended to sell the team to a third party who wanted to move the Predators to another state. As a result, Freeman began organizing a group of Nashville investors to buy the team. Leipold talked with Freeman about purchasing the Predators, but was also in conversation with other potential

buyers, including William Del Biaggio, III. Eventually, Leipold and the NHL Commissioner suggested to Freeman that his group of investors join forces with Del Biaggio to make a joint bid to buy the team. In so suggesting, Leipold related previous assertions made to him by Del Biaggio that stressed Del Biaggio's ability to fund the purchase and his experience with professional hockey.

During the summer and fall of 2007, Freeman and Del Biaggio engaged in negotiations concerning the acquisition of the Predators. Del Biaggio confirmed his ability to fund a $70 million share in the investment, and told Freeman he had connections in the NHL and hoped to become a major owner of a second NHL team. Freeman and his investors ultimately reached an agreement with Del Biaggio to purchase the Predators from Leipold for $193 million. Before the closing date, however, Del Biaggio contacted Freeman and informed him he could only invest $25 million, not the $70 million he originally promised. He proposed to replace the remainder with a $40 million increase in a loan from CIT Bank. Del Biaggio reported that he personally guaranteed the loan and that he would pay all the interest accrued on account of the loan increase. He also agreed to provide a personal guarantee to underwrite the Predators' lease obligations up to $10 million.

The sale of the Predators to Freeman and his cohort of investors, including Del Biaggio, closed on December 7, 2007. As a result of the sale, the Predators became wholly owned and operated by Nashville Hockey Club Limited Partnership, LLC, which is in turn wholly owned by Predators Holdings, LLC ("Holdings").

## B

Freeman invested $31 million to obtain 31 Common Units of Holdings. Common Units were subject to capital calls and not afforded a liquidation preference, unlike the other form of equity investment in Holdings, the Series A Units. Freeman also made a $5 million subordinated loan to Holdings in exchange for its promissory note.

Del Biaggio invested in Holdings through an entity called Forecheck Investments, LLC ("Forecheck"). Forecheck paid $30 million to obtain all 30 Series A Units of Holdings. These Series A Units gave Forecheck 32.6% of the voting units in Holdings. Del Biaggio in turn invested $25 million to acquire an 83.33% interest in Forecheck. As a result, Del Biaggio controlled roughly 27% of the voting securities of Holdings.

## C

Several months after the sale, Freeman learned that Del Biaggio never had the funds to support his guarantees and that the $25 million Del Biaggio already invested was in fact money he had embezzled from his clients. Del Biaggio filed for Chapter 11 bankruptcy which gave rise to the current proceeding. He was later indicted and convicted for various financial frauds and sentenced to an eight-year prison term.

Del Biaggio's fraud became headline news in Nashville, and as a result Predators revenues stagnated. To keep the business afloat, Holdings made capital calls to holders of the company's Common Units, including Freeman. Freeman satisfied this first capital call with a payment of $2,632,075. To prevent termination of the CIT Bank loan and the

Predators' lease, he also replaced Del Biaggio's guarantees with his own. Freeman alleges he was unable to satisfy later capital calls because of these guarantees, and that as a result, his membership units in Holdings became "heavily diluted and virtually worthless."

## D

In October 2008, Freeman filed a general unsecured claim against Del Biaggio's bankruptcy estate seeking damages of an undetermined amount arising from his fraud in the Holdings transaction.[1] In a later amended proof of claim, Freeman sought damages of $38,632,075. This amount included Freeman's initial $31 million investment in Holdings securities, the $5 million of subordinated debt he issued to Holdings in exchange for the promissory note, and the $2,632,075 paid in the first capital call. In response, the Liquidating Trust Committee of the Del Biaggio Liquidating Trust, the entity charged with prosecuting claims objections in Del Biaggio's bankruptcy, filed a counterclaim against Freeman and sought summary judgment. The counterclaim sought subordination and disallowance of Freeman's claim based on 11 U.S.C. § 510(b).

## E

The bankruptcy court granted the Committee's motion for summary judgment, finding Freeman's claim was subject to mandatory subordination under § 510(b). After determining

---

[1] Holdings' other investors submitted identical claims against Del Biaggio's estate. When the bankruptcy court approved Holdings' repurchase of Del Biaggio's estate's interest in the Predators, Holdings and all other investors except Freeman released their claims.

that Holdings was an "affiliate" of Del Biaggio via his ownership in Forecheck the court concluded that § 510(b) applied to Freeman's fraud claim because the plain language of the statute covers claims arising from the purchase of the securities of a debtor's affiliate. The bankruptcy court further reasoned that subordinating Freeman's claim under § 510(b) served the purposes of the statute, because as an investor in Holdings, he bargained for both a greater share of profits and a greater share of risks than Del Biaggio's unsecured creditors. The court also determined that the claims of Del Biaggio's other creditors were senior to Freeman's claim based on its conclusion that notes or shares issued by a subsidiary create no claim to the assets of a parent. Freeman appealed to the district court, which in turn affirmed the order and judgment of the bankruptcy court. Freeman timely appealed here.

II

We review a district court's decision on appeal from a bankruptcy court de novo, and apply the same standards applied by the district court without deference to that court. *In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012). When considering a bankruptcy court's grant of summary judgment, we apply the regular summary judgment standard in order to "determine whether there are any genuine issues of material fact and whether the bankruptcy court correctly applied the substantive law." *In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008) (quoting *In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243, 1245 (9th Cir. 1997)).

III

Freeman first contends that the bankruptcy court and the district court erred in applying Bankruptcy Code Section 510(b) to his claim against Del Biaggio.

Section 510(b) reads as follows:

§ 510.  Subordination

. . . .

> (b)  For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).  The statute operates in two steps.  First, it commands that specific types of claims relating to securities, including claims "for damages arising from the purchase or sale" of a debtor's securities or the securities of an affiliate "shall be subordinated."  *See In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 828–29 (9th Cir. 2001) (observing that subordination of qualifying claims under § 510(b) is mandatory).  Second, it identifies other claims to

which a qualifying claim must be subordinated—"all claims or interests that are senior to or equal the claim or interest represented by" the debtor's security or the security of his affiliate. Considered as a whole, § 510(b) "effectuate[s] one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007). This principle is broadly known as the absolute priority rule. *See, e.g.*, *In re Telegroup, Inc.*, 281 F.3d 133, 139–40 (3d Cir. 2002) (explaining the absolute priority rule and its relation to § 510(b)).

It is undisputed that Freeman's claim is a damages claim. Freeman also admits that his Holdings investments are securities[2] and that Holdings is an affiliate[3] of Del Biaggio. At this first step, Freeman argues only that the bankruptcy court and the district court erred in applying § 510(b) to his

---

[2] Interests in limited liability companies are "securities" under the Bankruptcy Code. *See In re Tristar Esperanza Props., LLC*, 782 F.3d 492, 495 (9th Cir. 2015) (noting that among the non-exhaustive list of items defined as securities in 11 U.S.C. § 101(49) "[an] LLC interest either qualifies as a 'transferable share' or falls within the broad residual category" (quoting *In re SeaQuest Diving, LP*, 579 F.3d 411, 418 (5th Cir. 2009))). Likewise, the term "security" as employed in the statute includes a promissory note. *See* 11 U.S.C. § 101(49)(A)(i).

[3] The Bankruptcy Code defines affiliate as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, by the debtor." 11 U.S.C. § 101(2)(B); *see also* 11 U.S.C. § 101(9)(A)(ii) (defining 'corporation' as including a "partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association"). It is uncontested that Del Biaggio controlled more than 20% of Holdings, given his interest in Forecheck.

claim against Del Biaggio because his claim is not one
"arising from the purchase or sale" of Holdings.

A

Beginning with the statute's plain text, we observe that
§ 510(b)'s "arising from" language reaches broadly to
subordinate damage claims involving qualifying securities.
The phrase "arising from" as employed in § 510(b)
"connotes, in ordinary usage, something broader than
causation" and is instead "ordinarily understood to mean
'originating from,' 'having its origin in,' 'growing out of,' or
'flowing from' or in short, 'incident to, or having connection
with.'" *In re Tristar Esperanza Props., LLC*, 782 F.3d 492,
497 (9th Cir. 2015) (quoting *Underwriters at Lloyd's of
London v. Cordova Airlines, Inc.*, 283 F.2d 659, 664 (9th Cir.
1960)). In *Tristar*, we applied this reading of the statute's
text to conclude that a claim involving the withdrawal of a
member from an LLC was rightly subordinated, despite the
fact that the withdrawal converted the claimant's interest
from an equity interest to a debt interest before the
bankruptcy filing. *Id.* at 497–98.

Our other precedents evince a similarly broad reading of
§ 510(b)'s "arising from" language. In *Betacom*, we found
that a damages claim based on a purported breach of contract
in a merger agreement was one that arose from the sale or
purchase of a debtor's securities under § 510(b), even though
the claimants never actually purchased or received stock.
240 F.3d at 830. In so holding, we construed the claim as one
"surrounding" the sale or purchase of a security of the debtor.
*Id.* at 829.

Likewise, in *American Wagering*, we concluded that § 510(b)'s "arising from" language requires that claims be subordinated "where there exists 'some nexus or causal relationship between the claim and the purchase of the securities.'" 493 F.3d at 1072 (quoting *Telegroup*, 281 F.3d at 138). Other courts interpreting § 510(b)'s "arising from" language have also endorsed this expansive "some nexus" reading. *See, e.g.*, *In re Am. Hous. Found.*, 785 F.3d 143, 155 (5th Cir. 2015); *SeaQuest Diving, LP*, 579 F.3d 411, 421–22 (5th Cir. 2009); *In re Med Diversified, Inc.*, 461 F.3d 251, 254–55 (2d Cir. 2006).

Applying our past reading of § 510(b), Freeman's damages claim is clearly one "arising from" the sale or purchase of securities in Holdings. The basis of Freeman's claim for damages against Del Biaggio's estate is not Del Biaggio's fraudulent misrepresentations, but rather Freeman's detrimental reliance on those misrepresentations in the form of his Holdings investment. Indeed, the damages sought by Freeman correspond exactly to the amount he invested in Holdings through his initial purchase of Holdings securities, the promissory note he obtained, and the money spent in the first capital call occasioned by his purchase of Common Unit stock. In light of these facts, we have no doubt that Freeman's claim "originates from" from his purchase of securities in Holdings, *Tristar*, 782 F.3d at 497, and thus possesses "some nexus" to that purchase, *Am. Wagering*, 493 F.3d at 1072 (citation and internal quotation marks omitted). Put simply, Freeman's claim is really no claim at all but for his investment in Holdings.

Freeman attempts to avoid this conclusion by analogizing his case to the facts of *American Wagering*, but such argument lacks merit. In *American Wagering*, we concluded

that a claimant's assertion of a court-ordered money judgment against a debtor for breach of contract was not subject to subordination under § 510(b). 493 F.3d at 1073. We reasoned that such a claim fell outside § 510(b)'s "arising from" provision because the contract with the debtor merely used stock value as a basis for calculating compensation and the claim did not seek to recover an investment loss. *Id.* But Freeman's claim does not value a free-standing injury by reference to a security; rather, as we have already explained, Freeman's asserted injury is inseparable from his Holdings investment.

Freeman also argues that his claim is not one "arising from the purchase or sale" of the securities of Del Biaggio's affiliate since he purchased the Holdings securities from Leipold rather than Del Biaggio. But nothing in § 510(b) requires that the debtor be the seller of the security at issue; indeed, the statute says only that a damages claim must be one arising from the purchase of securities "of an affiliate of the debtor," not *from* the debtor himself. § 510(b). The text of the statute clearly points toward subordination of Freeman's claim.

B

Freeman next seeks to avoid § 510(b)'s plain language by arguing that even if the statute's text points in favor of subordination, its purposes do not. Our Bankruptcy Appellate Panel ("BAP") appears to agree. In *In re Kahn*, 523 B.R. 175, 183 (B.A.P. 9th Cir. 2014), *appeal docketed*, No. 15-60002 (9th Cir. Jan. 13, 2015), the BAP concluded that the text of § 510(b) was ambiguous as to whether the law applies to individual debtors. Turning to legislative history and statutory purposes, the BAP then determined that applying

the statute to individual debtors was outside of Congress's intent. *Id.* While we generally treat decisions of the BAP as persuasive authority because of its "special expertise in bankruptcy issues and to promote uniformity of bankruptcy law throughout the Ninth Circuit," *In re Silverman*, 616 F.3d 1001, 1005 n.1 (9th Cir. 2010), in this case we are not persuaded.

"It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citation and internal quotation marks omitted). Only when statutes are ambiguous may courts look to legislative history. *See Nakano v. United States*, 742 F.3d 1208, 1214 (9th Cir. 2014). We doubt any recourse to sources outside the text is necessary to determine whether Freeman's transaction is one "arising from" the purchase or sale of the securities of a debtor's affiliate. As the Tenth Circuit has noted, § 510(b)'s "arising from" language has been "universally held" to cover "claims alleging fraud in the inducement to purchase or sell [a covered] security." *In re Geneva Steel Co.*, 281 F.3d 1173, 1174 (10th Cir. 2002).

## C

Even assuming consideration of the statute's legislative history and purposes is useful and appropriate, they provide no help to Freeman.

In *Betacom*, we identified "two main rationales for mandatory subordination: (1) the dissimilar risk and return expectations of shareholders and creditors; and (2) the reliance of creditors on the equity cushion provided by

shareholder investment."   240 F.3d at 830; *see also Am. Wagering*, 493 F.3d at 1072.  On the one hand, § 510(b) aims at subordinating claims "arising from" qualifying securities because "[s]hareholders expect to take more risk than creditors in return for the right to participate in firm profits." *Betacom*, 240 F.3d at 829.   On the other, § 510(b)'s mandatory subordination is justified because "creditors extend credit in reliance on the cushion of investment provided by the shareholders." *Id.*

1

Both Freeman and the BAP in *Kahn* appear to assume the risk-allocation rationale does not apply to cases like Freeman's because an investor cannot have a profit expectation in an individual debtor.  *See Kahn*, 523 B.R. at 183 (insisting that the risk-allocation rationale applies only to corporate debtors because "equity interests do not exist" in an individual debtor).  But that reading overlooks that Congress did not limit § 510(b)'s application to damage claims related to a debtor's own securities.  Instead, Congress included within § 510(b)'s ambit claims arising from the purchase of the securities of "an *affiliate* of the debtor."  We think it reasonable to assume that in expanding § 510(b)'s reach to include such claims, Congress recognized what our pre-Bankruptcy Code precedent already had—namely, that the fairness concerns underlying the risk-allocation rationale apply whether the investor's profit expectation is directed at the debtor or at an associated entity.  *See In re THC Fin. Corp.*, 679 F.2d 784, 786 (9th Cir. 1982) (rejecting the idea that "the relative equitable position of a defrauded stockholder should be enhanced" merely because a stockholder's claim involves an affiliate).

Those concerns are clearly implicated in Freeman's case. As an investor in an affiliate of Del Biaggio, Freeman bargained for increased risk in exchange for an expectation in the profits of Holdings as he himself admits. Del Biaggio's creditors made no such gamble. Allowing Freeman to stand on par with Del Biaggio's creditors "would give [Freeman] the best of both worlds—the right to share in profits if [Holdings] succeeded and the right to repayment as a creditor [of Del Biaggio] if it failed." *In re VF Brands*, *Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002). It was precisely that kind of inequity that Congress meant § 510(b) to eliminate. *See Tristar*, 782 F.3d at 496 ("Congress sought to subordinate claims . . . that unfairly shift to creditors risks associated with stock ownership."); *see also Telegroup*, 281 F.3d at 142 ("Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding.").[4]

---

[4] The BAP in *Kahn* also observed that in drafting § 510(b), Congress relied on an influential law review article by John J. Slain and Homer Kripke that discusses only corporate bankruptcy. *See Kahn*, 523 B.R. at 183; *see also* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ("Slain and Kripke"); H.R. Rep. No. 95–595, at 195–96 (1977). Congress may well have crafted § 510(b) with Slain and Kripke's policy rationales in mind. *See Betacom*, 240 F.3d at 829 (discussing Congress's apparent reliance on Slaine and Kripke's article). But there is no question that the text of § 510(b) reaches further than Slain and Kripke's precise concerns. Indeed, as the Second Circuit has observed, "Slain and Kripke did not propose subordinating claims arising from the purchase or sale of securities of the debtor's *affiliate*, and therefore had no occasion to consider how or whether the rationales they offered might bear upon the subordination of such securities." *See In re*

2

Freeman also argues that his claim cannot be subordinated since his investment in Holdings provided no equity upon which Del Biaggio's creditors could rely. But courts are otherwise agreed that the equity cushion rationale is the less important of the two, and actually unnecessary for § 510(b) to apply in the affiliate scenario. *See In re Lehman Bros. Inc.*, 808 F.3d 942, 949 (2d Cir. 2015) (observing the risk-allocation rationale is "more integral" than the equity-cushion rationale and "serves as an effective rationalization for subordination in those circumstances when an affiliate's securities provided the basis for the claim"); *see also SeaQuest Diving*, 579 F.3d at 421; *Med Diversified*, 461 F.3d at 259; *Geneva Steel*, 281 F.3d at 1180 n.3. That conclusion makes sense. In the context of claims "arising from" securities transactions involving a debtor's affiliate, the equity-cushion rationale will almost always remain unfulfilled, since creditors of the parent do not rely on the equity contributed by the affiliate's investors as the basis for extending credit. Refusing to apply § 510(b) in such cases would render the statute basically inapplicable to claims involving the securities of an affiliate—a result that Congress itself has foreclosed through the statutory text. *See Lehman Bros.*, 808 F.3d at 950 (noting that the text of § 510(b) indicates that "Congress has already determined" that the risk-allocation rationale "is strong enough to warrant subordination of claims arising out of transactions in affiliate

---

*Lehman Bros. Inc.*, 808 F.3d 942, 949 n.8 (2d Cir. 2015). Our analysis of § 510(b) convinces us that the presence or absence of a debtor's corporate status makes no difference. Freeman presents the quintessential case of an investor trying to recoup a bad investment ahead of those who assumed no such risks.

securities"); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2073 (2012) (observing that a "generalized statutory purpose" cannot override a statute's text).

Because we conclude that Freeman's claim is one "arising from" his purchase of securities and that § 510(b) is not limited to corporate debtors, we conclude that Freeman's claim must be subordinated.

## IV

Freeman next argues that even assuming his claim is subject to subordination, the bankruptcy court erred by subordinating his claim to the unsecured claims of Del Biaggio's creditors. According to Freeman, only "other interests in Holdings and claims against Holdings" are actually senior or equal to his claim. He contends that because his claims against Holdings are in a different priority scheme than claims against Del Biaggio, there are no claims to which his must be subordinated.

## A

*Kahn* offered a similar reading of § 510(b)'s "senior to or equal" language to conclude that the statute does not apply in individual debtor cases. The BAP reasoned that this language likely limits § 510(b) to corporate debtors because "[i]t is axiomatic that a claim or interest based on stock may exist only at a corporate level." 523 B.R. at 183. Moreover, the BAP observed that because other creditors with claims against the individuals in *Kahn* could not "seek recovery as creditors at the corporate level," these creditors held no claims senior to or equal to claims within the affiliate's own

priority scheme. *Id.* Like Freeman, the BAP in *Kahn* found § 510(b) inapplicable to individual debtors because an individual debtor's priority scheme cannot and does not include claims involving affiliate securities.

We decline to endorse this reading of § 510(b). Courts have differed in their readings as to the level of subordination mandated by § 510(b)'s "senior to or equal" provision when the qualifying claim involves affiliate securities. *See Lehman Bros.*, 808 F.3d at 950 & n.10 (collecting cases). Yet as the Second Circuit has noted, "[e]very other court that has applied § 510(b) to claims based on affiliate securities"— with the exception of *Kahn*—"has required subordination." *Lehman Bros.*, 808 F.3d at 950. There is good reason for that consensus. As the district court in this case noted, reading § 510(b)'s "senior to or equal" language as requiring subordination only when claims fall within the same priority scheme would render the statute's application to affiliates meaningless, since claims against a debtor arising from the purchase or sale of a security of the debtor's affiliate will almost never be included in the same priority scheme. Such a reading simply cannot be squared with the plain language of the statute. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (explaining that it is a "cardinal principle of statutory construction" that courts should "'give effect, if possible, to every clause and word of a statute'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)); *see also In re Lehman Bros. Inc.*, 519 B.R. 434, 450 (S.D.N.Y. 2014) (observing that limiting § 510(b)'s "senior to or equal" comparison to securities existing with the debtor's capital structure "would automatically exclude claims arising from the purchase or sale of securities of an affiliate in derogation of the plain language of the statute"). The question is not whether § 510(b) requires subordination of claims involving

affiliate securities in a debtor's bankruptcy proceeding, but *how* it does so.

B

Courts applying § 510(b)'s "senior to or equal" provision to claims involving affiliate securities have endorsed one of three approaches.

1

The first approach, employed by the bankruptcy court in this case, reads § 510(b)'s "senior to or equal" provision as requiring that a claim involving a security of the debtor's affiliate be subordinated below all claims actually included in the debtor's priority scheme, with the possible exception of claims involving an affiliate's common stock. *See In re Lernout & Hauspie Speech Prods., N.V.*, 264 B.R. 336, 341 (Bankr. D. Del. 2001) (considering an identical interpretation of § 510(b)). Under this approach, Freeman's claim would be subordinated to all general unsecured claims against Del Biaggio's estate on the theory that shares issued by a subsidiary create no claim to the assets of a parent. Although the bankruptcy court did not so explain, this approach places emphasis on § 510(b)'s mention of "such *security*" as the provision's interpretive touchstone. *See* § 510(b) (requiring subordination of qualifying claims to other claims or interests "senior to or equal the claim or interest represented by such security").

2

By contrast, a second approach employed by other courts focuses not on the affiliate security at issue, but instead on the

claim made against the debtor. In *VF Brands*, for instance, the Delaware bankruptcy court acknowledged that shareholders of a subsidiary are "not part of any priority scheme of claims against the parent," but concluded nonetheless that claims involving an affiliate's securities could be incorporated into the parent's priority scheme because these claims are *also* general unsecured claims against the debtor. 275 B.R. at 727. On this reading, claims involving the securities of an affiliate are conceptualized as general unsecured claims against the debtor, and subordinated under § 510(b) because they are "equal [to]" other general unsecured claims. *Id.*; *see also Lehman Bros.*, 503 B.R. at 784–85 (adopting the approach endorsed in *VF Brands*). Unlike the first approach that focuses on the affiliate security, this approach focuses on "the *claim* or interest represented by such security." § 510(b) (emphasis added). Like the first approach, however, this approach also mandates subordination of Freeman's claim. On this reading, Freeman's claim would be considered a general unsecured claim on par with other general unsecured claims against Del Biaggio's estate. Because Freeman's claim involves affiliate securities, however, § 510(b) mandates subordination of his claim to these other unsecured claims, since they are "equal [to]" Freeman's.

3

A third approach applying § 510(b)'s "senior to or equal" provision to claims involving affiliate securities has recently been endorsed by the Second Circuit. In *Lehman Brothers*, former underwriters of unsecured notes issued by Lehman Brothers Holdings, an affiliate of Lehman Brothers, Inc. (LBI), brought claims for contribution against LBI's bankrupt estate. 808 F.3d at 945. The underwriters admitted that their

claims against LBI fell under the "affiliate" provision of § 510(b). *Id.* Relying on *Kahn*, however, the underwriters asserted that there were no claims senior to or equal to their claim, arguing that claims involving an affiliate can be subordinated in a debtor's bankruptcy proceeding "only when claims also could be made in that proceeding based on ownership of the affiliate's securities." *Id.* The Second Circuit disagreed and found the underwriters' claims were properly subordinated. In so deciding, the Court held:

> [I]n the affiliate securities context, 'the claim or interest represented by such security' means a claim or interest of the same type as the affiliate security. Claims arising from securities of a debtor's affiliate should be subordinated in the debtor's bankruptcy proceeding to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.; and in some circumstances potentially a narrower sub-category).

*Id.* at 946. Like the two approaches described above, the Second Circuit's approach reads § 510(b)'s "senior to or equal" provision as requiring subordination of claims involving affiliate securities in a debtor's bankruptcy. But the approach employed by the Second Circuit arrives at this conclusion by reasoning that § 510(b) requires "superimpos[ing] the capital structure of the affiliate onto that of the debtor." *Id.* at 950. The court concluded that this reading of § 510(b) was the most consistent with § 510(b)'s directive that a claim involving qualifying securities be

subordinated to all claims senior to or equal to those "represented by" an affiliate security. *Id.* at 944–46.

We note that *Lehman Brothers* expressly distinguished *Kahn* as a case concerning only § 510(b)'s application to individual debtors. *See id.* at 950 n.11. But like the other approaches applying § 510(b) to claims involving affiliate securities, the Second Circuit's reading of § 510(b)'s "senior to or equal" provision is irreconcilable with the reading of the statute offered by *Kahn* and Freeman. In *Kahn*, the BAP said it would be nonsensical to apply § 510(b) to individual debtors because claims based on affiliate securities are by definition outside the priority scheme in an individual debt case. 523 B.R. at 183. But the court in *Lehman Brothers* concluded that claims involving affiliate securities can indeed be subordinated in a debtor's bankruptcy notwithstanding varying priority schemes, and that the affiliate's capital structure should be "superimpose[d]" on the structure of the debtor to determine the correct level of priority. 808 F.3d at 946, 950. Moreover, as with the other two approaches, applying the Second Circuit's approach in Freeman's case requires subordination of his claim below that of Del Biaggio's unsecured creditors. Although equity interests in Holdings lie outside the priority scheme governing Del Biaggio's bankruptcy, under this approach Freeman's claim would be treated *as if* it arose from equity interests in Del Biaggio other than common stock. Under the confirmed bankruptcy plan, this "type" of interest is considered junior to the claims of Del Biaggio's unsecured creditors, and accordingly subordinated under § 510(b).

C

We agree with the Second Circuit that of the three approaches, *Lehman Brothers* is likely the best interpretation of § 510(b)'s "senior to or equal" provision as it applies to claims involving affiliate securities. For the purposes of this appeal, however, we need not adopt a definitive reading of this portion of the statute. Because under any legitimate reading of § 510(b), the claims of Del Biaggio's general unsecured creditors are "senior to or equal [to]" Freeman's claim, his claim was rightly subordinated to the claims of Del Biaggio's creditors.

V

The bankruptcy court properly subordinated Freeman's claim under § 510(b). Fittingly, the order of the district court affirming that judgment is also

**AFFIRMED.**