*1067 RAWLINSON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that the bankruptcy court acted within its discretion when it converted the debtors’ bankruptcy proceedings from Chapter 13 to Chapter 7. I also join the majority’s conclusion that 11 U.S.C. § 510(b) applies to Debtors who are individuals. However, I dissent from the conclusion of the majority that § 510(b) is inapplicable because the claims of Kenneth Barton did not arise from a purchase or sale of securities. In my view, the opposite conclusion is inescapable-that Barton’s claim did arise from the purchase or sale of a security under § 510(b).
It is undisputed that Barton purchased securities in RPost International, Ltd. It is also undisputed that Debtors impermissi-bly converted Barton’s stock. However, that conversion did not erase the fact that Barton’s subsequent claims against Debtors arose from his previous purchase of securities.
The majority acknowledges that we have consistently interpreted the phrase “arising from” broadly. Majority Opinion, p. 1064. We most recently reiterated that interpretation in Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio), 834 F.3d 1003, 1009 (9th Cir. 2016) (“[W]e observe that § 510(b)’s arising from language reaches broadly to subordinate damage claims involving qualifying securities.”) (citation and internal quotation marks omitted). We went on to. explicate that the “arising from” phraseology is “broader than causation” and is “ordinarily understood to mean ‘originating from,’ ‘having its origin in’ ‘growing out of,’ or ‘flowing from’ or in short, ‘incident to or having connection with.’ ” Id. (citation omitted).
We rejected the creditor’s contention that his claims did not arise from the purchase or sale of securities because the claimant was indisputably an investor in the debtor’s affiliate. See id. at 1008-09. Rather, we continued to adhere to “one of the general principles of corporate and bankruptcy law” embodied within the text of § 510(b): “that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets.” Id. at 1008 (quoting Racusin v. American Wagering Inc. (In re American Wagering), 493 F.3d 1067, 1071 (9th Cir. 2007)).
In Del Biaggio, we cited our precedent concluding that a claimant was a shareholder even though the debtor’s defalcation “converted the claimant’s interest from an equity interest to a debt interest before the bankruptcy filing.” Id. at 1009 (quoting Pensco Trust Co. v. Tristar Esperanza Properties, LLC (In re Tristar Esperanza Properties, LLC), 782 F.3d 492, 497-98 (9th Cir. 2015)).
We also referenced American Broadcasting Sys. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 830 (9th Cir. 2001), as an example of our broad interpretation of § 510(b). See id. We explained that we applied § 510(b) to a damages claim predicated on a “purported breach of contract in a merger agreement” because the claim was “one ‘surrounding’ the sale or purchase of a security of the debtor.” Id. (quoting In re Betacom, 240 F.3d at 829).
In addition, we noted that our broad interpretation of the “arising from” language of § 510(b) is consistent with the interpretations advanced by our sister circuits. See id. (referencing Templeton v. O’Cheskey (In re Am. Hous. Found.), 785 F.3d 143 (5th Cir. 2015); SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP), 579 F.3d 411, 421-22 (5th Cir. 2009); Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 254-55 (2d Cir. 2006)).
*1068 The majority also cites our precedent and does not attempt to distinguish it, other than to try to fit the facts of this case within the confines of our decision in American Wagering. See Majority Opinion, pp. 1064-65. However, the fit is cramped and imperfect. Preliminarily, in Del Biaggio, we described our decision in American Wagering as requiring subordination “where there exists some nexus or causal relationship between the claim and the purchase of the securities.” Del Biaggio, 834 F.3d at 1009 (citation and internal quotation marks omitted) (emphasis added). We explained that the facts in American Wagering did not fall within our broad interpretation because, and only because, the claimant’s contract with the debtor was explicitly not for the purchase or sale of securities. See id. Rather, the contract was explicitly for services as a financial advis- or. The resulting agreement stated:
Should [the creditor] bring in a buyer ... said company will be paid a commission based on 5% of the purchase price.
In re Am. Wagering, 493 F.3d at 1069.
Seven months later, another agreement was entered into between the same parties, with the following provision:
[Claimant] has been our financial advis- or for the purpose of an initial public offering ... As compensation he would be paid 4 ½% of the final evaluation in the form of ... common stock and $150,000 cash.
Id. at 1070.
After two years, the debtor filed an action against the creditor seeking to invalidate the contract in its entirety. See id. Following a jury trial, a verdict was rendered in favor of the creditor for “stock ... in an amount equal to 4.5% of $45,000,000 [the final valuation of the common stock] and $150,000 in cash.” Id. Consistent with this verdict, the court awarded the creditor 337,500 shares of stock worth $2,025 million. See id.
The creditor appealed the award, arguing that it was error for the court to award specific performance by way of bestowing stock, when the creditor requested money damages. See id. We agreed and remanded for the court to calculate the monetary equivalent of the 337,500 shares. See Leroy’s Horse and Sports Place v. Racusin, 21 Fed.Appx. 716, 717-18 (9th Cir. 2001). On remand, the creditor was awarded monetary damages of $2,310,000-$150,000 cash plus $2,160,000 (the value of the stock as of the date when the creditor could have sold his shares). See American Wagering, 493 F.3d at 1070.
Shortly after the damages award, the debtor filed for Chapter 11 bankruptcy protection, and sought to subordinate the creditor’s claim pursuant to § 510(b). See id.
As we observed in Del Biaggio, fhe creditor in American Wagering never sought “to recover an investment loss.” Del Biaggio, 834 F.3d at 1009. Rather, the creditor’s “contract with the debtor merely used stock value as a basis for calculating compensation.” Id. We clarified in American Wagering that the creditor “received a money judgment for services rendered.” 493 F.3d at 1073. We referenced “[o]ur earlier decision” reversing the award of stock to the creditor as making it clear that the creditor’s “underlying claim [was] a debt claim, not an equity claim.” Id. The creditor “did not sue debtors as an equity investor seeking monetary damages for fraud ... related to their mishandling of shareholders’ economic investment.” Id. Instead, the creditor brought his action as an individual who was not compensated as provided in an employment agreement. See id.
In contrast, Barton initially brought his action in state court specifically describing *1069 himself as a shareholder who had been wrongfully deprived of his shares by the debtors. In his Third Amended Complaint, Barton asserted that he was issued 6,016,500 shares of RPost International Limited Stock, that Defendants now owned. Barton alleged that he was “a shareholder,” that he was owed a fiduciary duty of disclosure, and that Defendants wrongfully converted Barton’s shares of stock, causing Barton to suffer damages “[a]s a direct, proximate, and foreseeable result of the taking and conversion of Barton’s shares ,., ” Third Amended Complaint, Barton v. RPost International Ltd, Case No. YC061581, Superior Court of the State of California for the County of Los Angeles-Southwest District, February 16, 2011, pp, 5-9.
Consistent with Barton’s allegations focusing exclusively on the conversion of his shares, the Superior Court judge continued in the same vein. Indeed, the decision of the state court judge leaves no doubt about the genesis of Barton’s claims. The state court “issue[d] a declaration that Plaintiff Barton was at all relevant times an owner of 6,016,500 common shares ... and that he provided appropriate consideration for said shares of stock....” Statement of Decision, Barton v. RPost International Ltd., Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, August 3, 2012, p. 5. The state court prohibited RPost International “from taking any action to encumber, forfeit, and/or. cancel Barton’s shares without having obtained prior written approval from either the court, Barton or his duly authorized counsel.” Id.
The court ordered Defendants to restore the shares of stock to Barton. See id., p. 8. Leaving no doubt that the remedy was intended to restore Barton to the position of shareholder, the state court ordered that Barton “have no role in the management of the company but ... be given reasonable notice of meetings of its shareholders and major transactions.” Id. The state court “encouraged [the parties] to meet and confer to determine, on their own, a purchase price for Barton’s shares of stock so that a potentially uncomfortable relationship going forward can be avoided,” Id. (emphases added).
The state court’s order unequivocally restored Barton to his status as a shareholder in RPost International. Unlike the creditor in American Wagering, the record riowhere reflects that Barton objected to the remedy of specific performance. It was only after the punitive damages phase of the trial that the state court awarded the monetary value of the stock to Barton. See Ruling on Punitive Damages and Revisions to Statement of Decision, Barton v. RPost International Ltd., Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, June 18, 2013, pp. 1-2. Nevertheless, the state court continued to link its damages award to the conversion of Barton’s shares. See id., p, 2. The court explained that because “the assets and character of RPost International had changed dramatically ... returning the 6,016,500 shares to Mr. Barton would undoubtedly spark an endless round of post-judgment motions and additional lawsuits.” Id. However, the court never strayed from its conclusion that Mr, Barton was entitled to this remedy as a shareholder of RPost International. See id.
The facts of this case are not even close to those we considered in American Wagering. In that case, the creditor was never a shareholder of the debtor and never sought or accepted specific performance by way of the award of shares. See Am. Wagering, 493 F.3d at 1069-70. The plaintiff in that case steadfastly based his claim on an employment contact that was simply *1070 measured by the price of the stock. See id. at 1071 (noting that the original contract “only gave [the creditor] the monetary value of the shares of stock, not the stock itself’). Notably, the plaintiff in American Wagering actually appealed the district court’s decision awarding stock as a remedy. See id. at 1070. In contrast, Barton predicated his entire complaint on his status as a shareholder. No other basis for recovery was ever articulated, and Barton posed no objection when the state court awarded him shares and shareholder rights as a remedy. At bottom, Barton’s claim is closer to the facts of Del Biaggio, where we characterized the damages claim in a similar fraudulent scheme resulting in the loss of equity shares as “clearly one arising from the sale or purchase of securities.” 834 F.3d at 1009. As in Del Biaggio, the damages sought by Barton and awarded by the state court “correspond exactly to the amount [Barton] invested in [RPost International] through his initial purchase of [RPost International] securities ...” Id. As in Del Biaggio, “[Barton’s claim is really no claim at all but for his investment in [RPost International]. Id.
Similar to the majority’s approach, the creditor in Del Biaggio sought to “analogue] his case to the facts of American Wagering.” Id. We rejected the proposed analogy because the creditor in Del Biag-gio, like Barton, sought to “recover an investment loss,” id. rather than “valuing] a free-standing injury by reference to a security.” Id. at 1009-10. As in Del Biag-gio, without a separate source of injury unrelated to his security holdings, Barton’s “asserted injury is inseparable from his [RPost International] investment.” Id. at 1010.
The majority also relies upon the decision of a bankruptcy court, In re Angeles Corp., 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) that was summarily affirmed by the Bankruptcy Appellate Panel. See 199 B.R. 220 (B.A.P. 9th Cir. 1996).
The discussion section of Angeles is light on the underlying facts. The court noted only that “it appears that approximately $250 million of money invested by limited partners was lost from inception of the partnerships to the present,” Angeles, 177 B.R. at 924. Addressing the subordination question, the court ruled that “claims alleging misconduct, breach of fiduciary duty, or wrongful acts by Debtor ... in managing the partnerships subsequent to the purchase of the limited partnership interests are not ... subject to subordination ...” Id. at 926 (emphases in the original).
This interpretation ignores the broad language of § 510. See Weissman v. Pre-Press Graphics Co., Inc. (In re Pre-Press Graphics Co., Inc., 307 B.R. 65, 76 (N.D. Ill. 2014) (describing Angeles as “supporting the narrow approach” to interpreting § 510)). It is also directly contrary to more recent precedent. See SeaQuest Diving, 579 F.3d at 418 (involving rescission of creditor’s equity investment subsequent to the purchase); Tristar Esperanza Prop., 782 F.3d at 497 (explicitly rejecting the argument that the subsequent nature of the claim dictates the outcome); Del Biaggio, 834 F.3d at 1007 (addressing a subsequent fraud claim stemming from an equity investment).
In the twenty-plus years that Angeles has been in existence, the case has been widely and roundly criticized. In the case of In re Enron Corp., 341 B.R. 141, 154 (Bankr. S.D.N.Y. 2006), the bankruptcy court questioned whether Angeles “can still be considered good law” in view of “the recent trend in the case law.” The court described Angeles as “embracing a] restricted reading of section 510(b)” that had been “uniformly rejected” in more recent cases, and observed that these more *1071 recent cases “explicitly disagree[ ] with the legal principles” espoused in In re Angeles. Id. The bankruptcy court expressly referenced our decision in Betacom, noting that the holding in Betacom “eviscerates the logic of Angeles even if the Betacom court did not address [Angeles] directly.” Id. at 155 (citation omitted); see also Frankum v. Int’l Wireless Comm. Hldgs, Inc. (In re Int’l Wireless), 279 B.R. 463, 469 n.2 (D. Del. 2002) (“[T]he validity of ... Angeles in this circuit is suspect ... Accordingly, the Court declines to adopt the rationale[ ] of [Angeles.”]); In re Pre-Press Graphics, 307 B.R. at 77-78 (declaring Angeles “not ... persuasive” and undermined by more recent precedent from the Ninth Circuit); Id. at 76 (“The statutory interpretation set forth in [Angeles] ... has been called into doubt by recent decisions from the Third, Ninth and Tenth Circuits.”) (emphasis added); In re Granite Partners, 208 B.R. 332, 342-43 (Bankr. S.D.N.Y. 1997) (characterizing In re Angeles as “not persuasive”).
Finally, but not incidentally, I disagree with the majority’s conclusion that Barton should not be included within the category of investors who assumed the risk of investment loss. As a shareholder, Barton was the quintessential investor whose fortune was tied to the ups and downs of his investment, including those linked to fraud. See Del Biaggio, 834 F.3d at 1011 (“As an investor, [the creditor] bargained for increased risk in exchange for an expectation in the profits ...” “Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud ... to bootstrap their way to parity with general unsecured creditors ... ”) (citation and footnote reference omitted). Unfortunately, Barton is not exempt.
In sum, considering the broad language of § 510(b) and the correspondingly broad interpretation we have consistently applied in our precedent, Barton, a shareholder in the debtor corporation, asserted eonversion claims arising from the purchase of his shares. Without a doubt, his claim stemmed directly from the wrongful appropriation of the very shares he purchased. See Del Biaggio, 834 F.3d at 1009. I respectfully dissent from the majority’s contrary conclusion which, in my view, contravenes circuit precedent and the policy underlying § 510(b).