**In re INTERNATIONAL WIRELESS COMMUNICATIONS HOLDINGS, INC., et al., Debtors.**

**Ronald B. Frankum, et al., Appellants,**

**v.**

**International Wireless Communications Holdings, Inc., et al., Appellees.**

**Bankruptcy No. 98–2007–MFW. Civil Action No. 1–160–JJF.**

United States District Court, D. Delaware.

June 3, 2002.

---

**12.** The Defendant has conceded the Debtor's insolvency in this proceeding.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Of Counsel, Shalom L. Kohn, Kenneth P. Kansa, Sidley & Austin, Chicago, Illinois, for Appellants.

Pauline K. Morgan, M. Blake Cleary, Young Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for Appellees.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is an appeal by Appellants, Ronald B. Frankum and Charles R. Wassaf (collectively, "Appellants") from the January 23, 2001 Order (the "Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") subordinating the claim asserted by Appellants under Section 510(b) of the Bankruptcy Code. For the reasons set forth below, the decision of the Bankruptcy Court will be affirmed.

## BACKGROUND

### I. Procedural Background

On September 3, 1998, International Wireless Communications Holdings, Inc. and four of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On October 19, 1998, Appellants filed a Proof of Claim in the amount of $6,159,000. Appellants subsequently amended their Proof of Claim to include various clarifying statements.

By Order dated December 28, 1999, the Bankruptcy Court confirmed the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). Thereafter, the Debtors filed their First Omnibus Objection To Claims Pursuant To 11 U.S.C. § 502(b) And § 510 And Fed. R. Bankr.P. 3007 (the "Objection") seeking, among other things, to subordinate Appellants' Claim.

The Bankruptcy Court held a hearing to consider Appellants' Claim and the Debtors' Objection, and the parties briefed their positions following the hearing. On January 23, 2001, the Bankruptcy Court issued its Opinion and Order sustaining the Debtors' Objection and concluding that Appellants' Claim was subject to mandatory subordination under Section 510(b) of the Bankruptcy Code. This appeal followed.

### II. Factual Background

On July 17, 1997, Appellants became shareholders of International Wireless Communications Holdings, Inc. ("IWCH"), a Debtor in this action, pursuant to a Share Purchase Agreement between International Wireless Communications Pakistan Limited ("IWCPL"), an indirect subsidiary of IWCH, and Continental Communications Limited ("CCL"), Appellants' predecessor in interest. IWCH is a holding company which holds minority interests in operating companies that provide cellular and wireless telecommunications services in foreign countries. By the terms of the Share Purchase Agreement, CCL transferred 7,989,560 shares of Pakistan Mobile Communications (Pvt) Ltd. ("PMCL") to IWCPL in exchange for

$10,000,000 and 493,510 shares of common stock of IWCH, the parent of IWCPL.

In August 1997, IWCH and CCL executed the Supplement To Share Purchase Agreement (the "Supplement"). Under the terms of the Supplement, IWCH was required to have an initial public offering (the "IPO") within 18 months of the purchase and sale of the PMCL shares. If the IPO was not timely held, CCL had a variety of remedies, including the right upon written notice to IWCH to require IWCH to issue 49,351 additional shares of IWCH stock to CCL each year until an IPO is consummated, or to file a registration statement covering the IWCH stock held by CCL thereby permitting CCL to sell its stock. (D.I. 2, Exh. D–5, Supplement ("Supp.") § 2.3(a), (b)). If the IPO was timely held, or if CCL exercised its rights under Section 2.3 of the Supplement to sell its stock, but CCL received less than $6, 159,000 then IWCH would be obligated to issue additional IWCH stock to CCL so that the total value received by CCL was $6,159,000. Supp. at § 2.1. If the IPO was timely held, and CCL received an amount equal to or more than $300,000, no adjustment to the 493,510 shares issued to CCL would be made.

IWCH was unable to hold the contemplated IPO, because IWCH filed for bankruptcy before the 18 month deadline. As a result, neither an IPO nor a registration were feasible.

During IWCH's bankruptcy proceedings, Appellants, as successors in interest to CCL, filed a Claim for $6,159,000. The Debtors objected to Appellants' Claim on the ground that it should be subordinated pursuant to Section 510(b) or treated as an equity interest.

### III. The Bankruptcy Court's Decision

After a hearing on the Debtors' Objection, the Bankruptcy Court entered a Memorandum Opinion and Order dated January 23, 2001 subordinating Appellants' Claim under Section 510(b) of the Bankruptcy Code. Concluding that Appellants' Claim arose in connection with the purchase of the Debtors' stock, the Bankruptcy Court concluded that Appellants' Claim was subject to mandatory subordination. With this background in mind, the Court will address the issues raised by the instant appeal.

### DISCUSSION

### I. Standard of Review

Pursuant to Federal Rule of Bankruptcy Procedure 8013, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. In reviewing a case on appeal, the bankruptcy court's factual determinations are subject to deference and shall not be set aside unless clearly erroneous. *Id.; see In re Gutpelet*, 137 F.3d 748, 750 (3d Cir.1998). However, a bankruptcy court's conclusions of law are subject to plenary review and are considered de novo by the reviewing court. *Meespierson, Inc. v. Strategic Telecom, Inc.,* 202 B.R. 845, 847 (D.Del.1996). Mixed questions of law and fact are subject to a "mixed standard of review" under which the appellate court accepts finding of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641–642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)), *cert. denied.,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

**II.** **Whether The Bankruptcy Court Erred In Concluding That Appellants' Claim Is Subordinated Under Section 510(b) Of The Bankruptcy Code**

■ In pertinent part, Section 510(b) provides:

[A] claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Section 502 on account of such a claim, shall be subordinated to all claims or interest that are senior to or equal the claims or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). In arguing that the Bankruptcy Court's January 23 Order subordinating their claims was erroneous, Appellants contend that Section 510(b) does not apply to their claims because (1) the transaction did not involve a purchase or sale of IWCH's stock; (2) their Claim arises from a breach of the Supplement, and not from their purchase of IWCH's shares; (3) Section 510(b) only applies to tort claims for securities fraud; and (4) IWCH's breach of the Supplement occurred post-petition. The Court will address each of Appellants arguments in turn.

A. *Whether The Transaction Giving Rise To Appellants' Claim Involved The Purchase Or Sale Of IWCH's Stock*

Appellants contend that their Claim does not arise from their purchase of IWCH stock. Rather, Appellants maintain that their Claim arose from the obligations of IWCH when it purchased the stock of PMCL, which is not the "debtor or an affiliate of the debtor" within the meaning of Section 510(b). In support of their argument, Appellants direct the Court to the language of the Share Purchase Agreement which describes IWCH as the purchaser of PMCL stock. Appellants also direct the Court to the testimony of Appellant, Ronald B. Frankum, that Appellants did not seek to become shareholders of IWCH. Appellants argue that because they did not seek to become shareholders of IWCH, they should not be exposed to the risks of shareholder ownership and subordination under Section 510(b).

The Court disagrees with Appellants' argument. While the Share Purchase Agreement contemplated the sale/purchase of PMCL stock as the primary transaction, it also involved the secondary transaction of IWCH stock. Pursuant to the express terms of the Share Purchase Agreement, Appellants were to acquire IWCH stock as part of their compensation for the sale of the PMCL stock. That Appellants received the Debtors' stock as part of a compensation package does not preclude the transfer from being characterized as a purchase/sale of the Debtors' stock. *See e.g. In re Baldwin–United Corp.,* 52 B.R. 539, 540, n. 1 (Bankr.S.D.Ohio 1985) (recognizing that receiving shares as consideration for shares of another entity constitutes a purchase or sale within the meaning of Section 510(b)).[1] Based upon the issuance of their stock to Appellants, the Debtors, in turn, undertook the obligations forming the basis of Appellants'

---

1. Appellants contend that *Baldwin* is distinguishable, because the court relied on the definition of the term "purchaser" as used in Section 101(35) of the Bankruptcy Code to support its conclusion. However, the *Baldwin* court's decision was made in the context of Section 510(b), and therefore, the Court

Claim, i.e. the obligations to have a timely IPO or issue additional shares to Appellants. *In re Kaiser Group Int'l, Inc.,* 260 B.R. 684, 687 (Bankr.D.Del.2001) (holding that appellants' claim was based on damages resulting from sale/purchase of the debtors' securities where the debtors undertook an obligation to pay Merger Value in connection with the issuance of their stock and as a guarantee of the value of their stock), aff'd sub. nom., *Pippin v. Kaiser Group Int'l, Inc.,* Civ. Act. No. 01–508–JJF (Nov. 29, 2001). Accordingly, in these circumstances, the Court concludes that Appellants' Claim is a claim based upon the sale/purchase of the Debtors' stock.

Appellants maintain that they should be considered a fixed creditor for the purchase price of their company. To this effect, Appellants direct the Court to provisions of the Supplement aimed at allowing Appellants to recoup the purchase price through the issuance of additional shares of IWCH stock. However, there are also provisions of the Supplement which suggest that if the value of IWCH stock exceeded the purchase price for the company, Appellants would reap the reward of that benefit without a downward adjustment. In this regard, the Court finds the instant case analogous to the circumstances in *In re Betacom of Phoenix, Inc.,* 240 F.3d 823 (9th Cir.2001).

In *Betacom,* the shareholders of Betacom, Inc. entered into a merger agreement with American Broadcasting Systems, Inc. ("ABS"). Pursuant to the agreement, ABS was to acquire Betacom and the shareholders were to receive ABS stock. The ABS shares were held in escrow and never delivered to the shareholders. ABS then filed for bankruptcy and the shareholders filed a claim for damages. Although the shareholders never

actually acquired the ABS shares, the court concluded that their claims should be subordinated. Recognizing a distinction between creditors and shareholders, the court explained:

> Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt. It is unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders.

*Id.* at 829.

In this case, Appellants sought the possibility of more than the repayment of a fixed debt, and as such, should not be treated as mere creditors. Appellants were experienced businesspeople who traded their stock in one company for the stock of another. While it may be true that Appellants sought to minimize the risk they incurred by providing for additional stock disbursements and the like, they nonetheless took the risk that IWCH could go bankrupt. *Id.* at 829. Accordingly, the Court concludes that the Bankruptcy Court did not err in concluding that the transaction at issue involved the sale/purchase of IWCH stock.

### B. Whether Appellants' Claim "Arises From" A Purchase Or Sale Of IWCH Stock

Appellants raise two arguments related to the "arising from" language of Section 510(b). Appellants contend that their Claim does not "arise from" the sale of IWCH stock, because (1) it arose from the Debtors' breach of the Supplement and not the Share Purchase Agreement and (2) the alleged breach occurred nearly 18 months after the IWCH stock was conveyed to Appellants.

cannot conclude that the *Baldwin* decision is irrelevant.

■ The Court of Appeals for the Third Circuit recently examined the meaning of the phrase "arising from" as used in Section 510(b). Although the Third Circuit concluded that the phrase "arising from" was ambiguous, the Third Circuit recognized, as a textual matter, that the phrase "arising from" requires "some nexus or causal relationship between the claims and the purchase of the securities." *Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 138 (3d Cir.2002). Addressing the question of whether "arising from" is limited to actionable conduct that occurs at the time of the purchase of the security, the Third Circuit also concluded that such a distinction "lack[s] any meaningful basis as a matter of Congressional policy ..." *Id.* at 141.

■ Based on the Third Circuit's conclusion in *Telegroup*, the Court concludes that the fact that the Debtors' alleged breach occurred subsequent to the issuance of the stock in this case is insufficient to remove Appellant's Claim from the scope of Section 510(b). *See also In re NAL Financial*, 237 B.R. 225, 231 (Bankr. S.D.Fla.1999) ("[T]here is no distinction between fraud committed during the purchase of securities and fraud (or a wrongful act) committed subsequent thereto that adversely affects one's ability to sell those securities. They are both claims that arise from the purchase and sale of securities."); *In re Granite Partners*, 208 B.R. 332, 342 (Bankr.S.D.N.Y.1997) (holding that post-investment fraud is a claim arising from purchase or sale of securities).[2]

As for Appellant's argument that their Claim arose from a breach of the Supplement and not a breach of the Share Purchase Agreement, the Court is not persuaded by this distinction. Applying the *Telegroup* rationale, the Court finds that some causal connection exists between the alleged breach of the Supplement and the purchase of the Debtors' stock. Indeed, a breach of the Supplement could not have occurred but for Appellants' purchase of the IWCH stock.

However, the *Telegroup* court did not rely solely on this "causal connection" analysis. In determining the applicability of Section 510(b), the *Telegroup* court examined the policies behind Section 510(b) and the circumstances of the shareholders. The *Telegroup* court recognized that "[i]n enacting Section 510(b), Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy." *Id.* at 142. In concluding that the claims of the Telegroup stockholders were subordinate under Section 510(b), the Third Circuit explained:

> [B]ecause claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors. Were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and

---

**2.** Appellants direct the Court to *In re Amarex, Inc.*, 78 B.R. 605 (W.D.Okla.1987) and *In re Angeles Corp.*, 177 B.R. 920, 927–928 (Bankr. C.D.Cal.1995) to support their argument that claims based on conduct by the debtor after the purchase of stock should not be subordinated under Section 510(b). In construing Section 510(b), however, the Court has previously expressed its preference for the analyses of the *NAL* and *Granite Partners* decisions. *Liff v. Phillip Services (Delaware) Inc.*, Civ. Act. No. 00–502–JJF (D.Del. Nov. 28, 2001). Further, the validity of *Amarex* and *Angeles* in this circuit is suspect given the Third Circuit's approach to this issue in *Telegroup*. Accordingly, the Court declines to adopt the rationales of the *Amarex* and *Angeles* decisions.

share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails. *Id.* at 142.

Although there are differences between the Telegroup shareholders and Appellants in this case, Appellants retained the right under the applicable agreements to participate in corporate profits if IWCH succeeded. As the Court recognized previously, this aspect of Appellants' arrangement made them more akin to investors than fixed creditors. Appellants' status as a shareholder is further confirmed by that portion of the Supplement which forms the basis for their Claim. Under the terms of the Supplement, the Debtor was to consummate an IPO. If an IPO was not timely consummated, Appellants were entitled to additional shares of stock, or they could require IWCH to file a registration statement. Thus, as the Bankruptcy Court noted, the essence of Appellants' Claim is that of a shareholder, because Appellants were prevented from selling their stock or realizing the value of their investment by the Debtor's breach of the Supplement. Accordingly, in these circumstances, the Court concludes that Appellants' Claim is appropriately treated as a claim for damages arising from the purchase of the Debtors' stock, and therefore, the Bankruptcy Court correctly concluded that their Claim is subject to mandatory subordination under Section 510(b).

C.  *Whether Section 510(b) Only Applies To Tort Claims For Securities Fraud*

■ In their briefing, Appellants raise an additional argument that Section 510(b) is inapplicable to their Claim, because Section 510(b) is limited to tort claims and their Claim is based upon breach of contract. By subsequent letter, Appellants

have recognized that the Third Circuit's decision in *Telegroup* precludes them from successfully pressing this argument. (D.I. 15 at 2). Recognizing that claimants could easily turn their fraud claims into breach of contract claims and relying upon the Bankruptcy Court's decision in this case to that effect, the Third Circuit stated, "[W]e see no reason as a matter of policy why a fraud claim against Telegroup for misrepresenting to buyers that it was using its best efforts to register its stock should be subordinated under 510(b), but a contract claim against Telegroup for breaching its agreement to use its best efforts to register its stock should not." *Id.* at 143 (citing *In re Int'l Wireless Communications Holdings, Inc.*, 257 B.R. 739, 746 (Bankr. D.Del.2001)). Accordingly, the Court concludes that Section 510(b) is not limited to tort claims for securities fraud, and thus, Appellant's Claim is not exempt from the scope of Section 510(b) because it is asserted as a contract claim.

D.  *Whether Appellants' Claim Should Not Be Subordinated Under Section 510(b), Because The Alleged Breach Of The Supplement Occurred Post–Petition*

Appellants also contend that their Claim should not be subordinated under Section 510(b), because the Debtors' alleged breach of the Supplement occurred post-petition. In support of their position, Appellants direct the Court to two decisions by the Court of Appeals for the Sixth Circuit, *KDI Corp. v. Former Shareholders of Labtron*, 536 F.2d 1146 (6th Cir. 1976) and *In re KDI Corp.*, 477 F.2d 726 (6th Cir.1973). Reading the *KDI* decisions together, Appellants contend that they articulate a clear rule:

Where the guaranty claim matured prepetition, the claimant entitled to receive more stock pre-petition would be deemed to have received all that stock pre-petition, and therefore any claim as-

serted for failure to deliver such stock would be in its capacity as a shareholder. By contrast, where the guaranty claim matured post-petition, the claim did not arise from the shares which the claimant possessed, but from the shares which it was promised but not given— and this right to receive additional shares was a creditor claim, and not a shareholder claim.

(D.I. 7 at 20–21). According to Appellants, their Claim does not arise from the shares of stock that they received in the initial transaction. Rather, Appellants contend that their Claim arises from the Debtor's breach of their obligation to provide Appellants with additional value, an obligation which Appellants contend arose post-petition.

■ The Court disagrees with Appellants' argument. First, as the Bankruptcy Court observed, both *KDI* decisions were decided prior to the passage of the Bankruptcy Code. As such, these cases did not address the effect of Section 510(b). Further, as the Bankruptcy Court also recognized, the Debtors' breach of the Supplement occurred with their rejection of the Supplement under the terms of their confirmed plan. Thus, by operation of 11 U.S.C. § 365(g), the Debtors' breach gave rise to a pre-petition claim by Appellants. Accordingly, the Court cannot conclude that Appellants' Claim arose post-petition such that it should not be subject to Section 510(b).

## CONCLUSION

For the reasons discussed, the Bankruptcy Court's January 23, 2001 Order subordinating Appellants' Claim pursuant to Section 510(b) of the Bankruptcy Code will be affirmed.