**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE ZAFAR DAVID KHAN,<br>*Debtor*,<br><br>Zafar David Khan,<br>*Appellant*,<br><br>v.<br><br>KENNETH BARTON; THOMAS BURKE;<br>NANCY K. CURRY, Chapter 13<br>Trustee,<br>*Appellees.* | No. 15-60002<br><br>BAP No.<br>14-1021 |
| IN RE TERRANCE ALEXANDER<br>TOMKOW,<br>*Debtor*,<br><br>TERRANCE ALEXANDER TOMKOW,<br>*Appellant*,<br><br>v.<br><br>KENNETH BARTON,<br>*Appellee.* | No. 15-60003<br><br>BAP No.<br>14-1060 |

IN RE TERRANCE ALEXANDER
TOMKOW,

*Debtor*,

No. 15-60004

BAP No.
14-1020

TERRANCE ALEXANDER TOMKOW,
*Appellant*,

v.

KENNETH BARTON,
*Appellee.*

IN RE ZAFAR DAVID KHAN,
*Debtor*,

No. 15-60005

BAP No.
14-1041

ZAFAR DAVID KHAN,
*Appellant*,

v.

KENNETH BARTON,
*Appellee.*

IN RE TERRANCE ALEXANDER
TOMKOW,

*Debtor*,

TERRANCE ALEXANDER TOMKOW,
*Appellant*,

v.

KENNETH BARTON,
*Appellee.*

No. 15-60006

BAP No.
14-1061

IN RE ZAFAR DAVID KHAN,
*Debtor*,

ZAFAR DAVID KHAN,
*Appellant*,

v.

KENNETH BARTON,
*Appellee.*

No. 15-60007

BAP No.
14-1062

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Taylor, Dunn, and Kirscher, Bankruptcy Judges, Presiding

Argued and Submitted November 9, 2016
Pasadena, California

Filed January 23, 2017

Before: Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Fernandez;
Partial Concurrence and Partial Dissent by
Judge Rawlinson

## SUMMARY[*]

### Bankruptcy

On appeal from the Bankruptcy Appellate Panel, the panel affirmed (1) the bankruptcy court's decision that a creditor's claims were not subordinated and (2) the bankruptcy court's conversion of the debtors' Chapter 13 bankruptcy proceedings to Chapter 7 proceedings.

11 U.S.C. § 510(b) requires that claims for damages arising from the purchase or sale of a security of the debtor or an affiliate of the debtor be subordinated to certain other claims or interests.  Disagreeing with the BAP, and following *Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman (In re Del Biaggio)*, 834 F.3d 1003 (9th Cir. 2016), the panel held that § 510(b) applies when debtors are individuals.  Nevertheless, the panel agreed with the bankruptcy court that the creditor's claims did not arise out of a purchase or sale of securities, but rather were based upon a

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

judgment entered against the debtors on account of their actions in fraudulently converting the creditor's stock.

The panel held that the bankruptcy court did not clearly err when it found bad faith and did not abuse its discretion when it converted the debtors' Chapter 13 proceedings to Chapter 7 proceedings.

Concurring in part, Judge Rawlinson agreed with the majority that the bankruptcy court acted within its discretion when it converted the proceedings from Chapter 13 to Chapter 7. She also joined the majority's conclusion that 11 U.S.C. § 510(b) applies to debtors who are individuals. Judge Rawlinson dissented from the conclusion of the majority that § 510(b) was inapplicable because the creditor's claims did not arise from a purchase or sale of securities.

## COUNSEL

Lewis R. Landau (argued), Calabasas, California, for Appellants.

Patrick C. McGarrigle (argued) and Michael J. Kenney, McGarrigle Kenney & Zampiello APC, Chatsworth, California, for Appellees.

## OPINION

FERNANDEZ, Circuit Judge:

Zafar David Khan and Terrance Alexander Tomkow (collectively "Debtors") appeal the judgment[1] of the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP"), which affirmed the decision of the bankruptcy court that the claim of Kenneth Barton was not subordinated pursuant to the provisions of 11 U.S.C. § 510(b),[2] and converted[3] the Debtors' Chapter 13 bankruptcy proceedings[4] to Chapter 7 proceedings.[5] We affirm the decision of the bankruptcy court.

## BACKGROUND

In 2013, Barton obtained a Superior Court of the State of California ("Superior Court") judgment against the Debtors and RPost International, Ltd. ("RIL") for conversion, fraud, breach of fiduciary duty, and violation of California Business and Professions Code Section 17200, based upon Barton's allegations that the Debtors fraudulently converted his 6,016,500 shares of common stock in RIL.

---

[1] *Khan v. Barton, (In re Khan)* ("*Khan I*"), 523 B.R. 175, 178 (B.A.P. 9th Cir. 2014).

[2] Hereafter all references to section numbers are to sections of Title 11 of the United States Code, unless otherwise indicated.

[3] *See* § 1307(c).

[4] §§ 1301–1330.

[5] §§ 701–784.

The Superior Court found that after Barton and the Debtors founded RIL, they each received an initial distribution of RIL stock in 2001. The consideration for the stock "was stated to be unreimbursed expenses and compensation."

After suffering a stroke, Barton took leave from RIL. Thereafter, the Debtors cancelled Barton's shares of stock and returned them to the RIL treasury in June or July of 2009. The Superior Court held that the Debtors fraudulently converted Barton's stock in 2009 and determined that they had forged corporate resolutions in an attempt to support their fraud and either "misplaced or destroyed" the shareholder registry, which was "the best evidence of the issuance of [the] stock." The Superior Court then ruled that Barton should recover damages and that his 6,016,500 shares should be reinstated. After further hearings, the Superior Court determined Barton should, instead, receive the value of the converted stock. Therefore, it fixed damages for the conversion at $3,850,560, based upon the value of the RIL stock as of June 30, 2009, the date of conversion, which was $0.64 per share. After adjustments, a judgment including $3,840,060 for the converted shares was entered in Barton's favor.

A few days before the Superior Court intended to determine the value of the RIL stock for the award of compensatory and punitive damages, each of the Debtors had separately filed a Chapter 13 petition for bankruptcy. At the § 341 (creditors meeting) hearing, the Debtors did not give meaningful information regarding their companies' business transactions, stock valuation, and settlements. And, in their Chapter 13 Schedules, they each reported their RIL stock as having a $0 value and listed Barton's conversion judgment as

having a value of only $100,000 with a "[remainder] unliquidated; pending [the Superior Court] proceedings." Neither Debtor filed amended schedules or an amended Plan that included the full value of the judgment after it was rendered.

Barton filed a proof of claim in each case and the Debtors objected. They argued that the claims should be mandatorily subordinated under § 510(b), which, they said, would render the claim unenforceable and subject to disallowance under § 502(b)(1). The Debtors also filed separate actions for mandatory subordination and disallowance on the same grounds as those alleged in their objections. The bankruptcy court dismissed the separate actions after the parties litigated the claim objections to resolution because the same result would apply to those actions.

Barton had filed separate motions to convert each case to Chapter 7, arguing that the Debtors acted in bad faith, which was cause to convert under § 1307(c).

After a hearing, the bankruptcy court ruled on the Debtors' claim objections based on subordination and disallowance and on Barton's motions to convert. It held that Barton's claims were not subject to subordination because they were not "for damages arising from the purchase or sale of . . . a security." § 510(b). Rather, the bankruptcy court determined that Barton's claims were based upon the Superior Court judgment for fraud and conversion. The bankruptcy court did not specifically address the disallowance issue, but did dismiss the Debtors' separate objections related to that issue. Finally, the court granted Barton's motions to convert. As to each of the Debtors, it found that "the timing of the filing was intended to defeat the

state court action . . . [because] it was likely that there was going to be an award of damages that would have put these Debtors outside a Chapter 13." It also found that the Debtors manipulated the bankruptcy process and concealed assets. The Debtors then appealed to the BAP.

The BAP affirmed the bankruptcy court's subordination determination, but on different grounds. It determined that § 510(b) did not "apply in an individual debtor case." *Khan I*, 523 B.R. at 183. The BAP also affirmed the bankruptcy court's refusal to disallow Barton's claims because they were not subject to subordination and, even if they were, "there [was] no basis for claims disallowance under § 502(b)(1)." *Id.* at 182. Lastly, the BAP held that the bankruptcy court did not abuse its discretion when it found bad faith and converted the cases from Chapter 13 proceedings to Chapter 7 proceedings. *Id.* at 185–87. These appeals followed.

JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1).

"We review decisions of the BAP de novo." *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 876 (9th Cir. 2008). "This court independently reviews the bankruptcy court's rulings on appeal from the BAP." *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 547 (9th Cir. 2004). "'Because we are in as good a position as the BAP to review bankruptcy court rulings, we independently examine the bankruptcy court's decision, reviewing the bankruptcy court's interpretation of the Bankruptcy Code de novo and its factual findings for clear error.'" *Id.* "[We] accept findings of fact made by the bankruptcy court unless [those] findings leave the definite and firm conviction that a mistake has been

committed by the bankruptcy judge." *Aalfs*, 525 F.3d at 876 (internal quotation marks omitted).

"We review for abuse of discretion the bankruptcy court's ultimate decisions . . . to convert [the cases] from Chapter 13 to Chapter 7." *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 771 (9th Cir. 2008). A court abuses its discretion when it makes "a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). We "review the bankruptcy court's finding of bad faith for clear error." *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1222–23 (9th Cir. 1999).

## DISCUSSION

We will first consider the Debtors' assertion that the bankruptcy court and the BAP erred when they determined that § 510(b) did not apply.[6] Thereafter, we will consider their argument that those courts should not have determined that the conversion of their proceedings from Chapter 13 to Chapter 7 was appropriate.

### I. *Subordination of Barton's Claims*

Section 510(b) requires that claims for damages "arising from the purchase or sale" of a "security of the debtor or of an affiliate of the debtor" shall be subordinated to certain

---

[6] In light of our determination that § 510(b) does not apply, we need not consider the Debtors' assertion that Barton's claims should be disallowed because they were subordinated.

other claims or interests.[7]  As already noted, the bankruptcy court determined that the section did not apply because Barton's claims did not arise from the purchase or sale of a security.  The BAP affirmed the bankruptcy court on the basis that the section did not apply because the Debtors were individuals. *See Khan I*, 523 B.R. at 183–84.  However, after the BAP ruled, we held that § 510(b) does apply when debtors are individuals and in doing so we specifically disagreed with *Khan I. See Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman (In re Del Biaggio)*, 834 F.3d 1003, 1010 (9th Cir. 2016).  That effectively overturned the basis of the BAP's decision, and we now make that explicit by rejecting the BAP's contrary decision.

Nevertheless, we affirm the bankruptcy court's decision on the basis stated by that court, that is, we agree that Barton's claims did not arise out of a purchase or sale of securities.  No doubt Barton did purchase securities in RIL in 2001 shortly after RIL was founded.  Also, we assume that RIL is an affiliate of the Debtors.[8]  However, Barton's claims

---

[7] More particularly, the section reads as follows:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

[8] The Debtors alleged that each owned over 20% of RIL. *See* § 101(2)(B) (defining "affiliate").

against the Debtors do not arise from his purchase of RIL securities. Rather, they are based upon the judgment entered against the Debtors by the Superior Court on account of their actions many years later (2009) when they fraudulently converted Barton's stock.

Of course, we have given a broad interpretation to the "arising from"[9] language of the statute. For example, in *Del Biaggio*, we found a sufficient nexus to a purchase and sale where the claimant (Freeman) had been fraudulently induced by the individual debtor to invest in an affiliate of the debtor. We pointed out that "Freeman's claim is really no claim at all but for his investment in [the affiliate]." *Del Biaggio*, 834 F.3d at 1009. In fact, Freeman's claim was not for misrepresentations as such, but for the investment he made in "detrimental reliance on those misrepresentations." *Id.* And what he sought "correspond[ed] exactly to the amount he invested." *Id.*

The case at hand is quite different from *Del Biaggio* because here what Barton seeks has nothing to do with his investment, other than the fact that he had purchased the now-purloined securities many years earlier. And the damages he sought were not remotely related to the purchase; they were simply a judgment measured by the value of the converted property when the conversion took place.

We recognize that in other cases, where no actual purchase or sale had been consummated, we found that claims, nevertheless, arose from a purchase or sale transaction. *See, e.g.*, *Pensco Tr. Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 782 F.3d

---

[9] *See* § 510(b).

492, 496–97 (9th Cir. 2015) (the claim arose out of a failed agreement by the debtor to purchase claimant's stock); *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829–31 (9th Cir. 2001) (a merger fell through so no ultimate sale took place, but claim still arose from a sales transaction). While those cases do bespeak a broad interpretation of "arising from," there is a limit to the reach of § 510(b), which stops short of encompassing every transaction that touches on or involves stock in a corporation. That is well explicated in *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067 (9th Cir. 2007).

In *Racusin*, the claimant was promised that due to past services he would be paid, in part, with common stock of the company upon completion of a common offering or initial public offering. *Id.* at 1070. When the contract was breached, he sued the company and others for damages. *Id.* The district court determined that Racusin should receive shares of stock, and he appealed. *Id.* He did so on the basis that he did not want stock; he wanted damages. We agreed with him. *Id.* Thus, we "remanded the case to the district court to calculate the monetary value of the . . . shares." *Id.* The amount was determined, the debtors quickly filed for bankruptcy, Racusin filed a claim, and the debtors asserted that § 510(b) required subordination. *Id.* We disagreed. *Id.* at 1071. We pointed out that Racusin did not seek to be, and was not, a shareholder. Rather, the value of the stock was just the measuring stick for determining the "compensation owed for services he performed pursuant to a contract that the debtors breached." *Id.* at 1073. Thus, he was a true creditor rather than an equity investor in a "now-bankrupt corporation." *Id.*; *see also In re Angeles Corp.*, 177 B.R. 920, 926 (Bankr. C.D. Cal. 1995) (debtor had committed bad acts after claimant's purchase of securities was complete, and

claims did not arise from the purchase), *aff'd*, 199 B.R. 220 (B.A.P. 9th Cir. 1996).

Here, Barton sought and obtained damages. Even though his damage award for conversion was based on the value of the securities at the time of conversion, his action did not arise out of the purchase of the securities and the risks that the purchase might entail. It arose out of the Debtors' conversion of the securities many years later. The value of the securities at the date of conversion was the measuring stick.

Moreover, the oft-quoted rationales for the § 510(b) subordination requirement[10] do not apply here. Primarily, the separate wrongdoing of the Debtors had no connection to the purchase or sale of Barton's shares of stock in RIL; nor did the judgments against the Debtors that form the basis for Barton's bankruptcy claims arise from a purchase or sale. In any event, the risk that those who purchase or sell stock (investors in a corporation) assume and expect to take is not that the shares themselves will later be stolen outright by other individuals.[11] Nor, to the extent it applies at all, does the equity cushion rationale affect our decision here.[12] Even if the Debtors' creditors did, somehow, rely upon the equity contributed by RIL's investors, that does not touch upon the separate torts committed by the Debtors in this case.

---

[10] *See Betacom*, 240 F.3d at 830 (dissimilar risks and equity cushion rationales).

[11] *See id.*; *see also Del Biaggio*, 834 F.3d at 1010–11.

[12] *Betacom*, 240 F.3d at 830; *see also Del Biaggio*, 834 F.3d at 1011–12.

In short, the bankruptcy court did not err when it refused to subordinate Barton's claims pursuant to § 510(b).

II. *Conversion of Chapter 13 Proceedings to Chapter 7 Proceedings*

The Debtors also assert that the bankruptcy court clearly erred when it found bad faith,[13] and abused its discretion[14] when it converted their Chapter 13 proceedings to Chapter 7 proceedings.[15]  We disagree.  The bankruptcy court was required to and did consider "the totality of the circumstances."  *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir. 1994) (per curiam) (internal quotation marks omitted).  However, the Debtors point to the factors we outlined in *Leavitt*, 171 F.3d at 1224.  Those are:

> (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his Chapter 13 petition or plan in an inequitable manner;

> (2) the debtor's history of filings and dismissals;

---

[13] *See Leavitt*, 171 F.3d at 1222–23; *de la Salle v. U.S. Bank, N.A. (In re de la Salle)*, 461 B.R. 593, 605 (B.A.P. 9th Cir. 2011).

[14] *See Rosson*, 545 F.3d at 771; *see also Hinkson*, 585 F.3d at 1263–64.

[15] *See* § 1307(c).

(3) whether the debtor only intended to defeat state court litigation; and

(4) whether egregious behavior is present.

*Id.* (citations, internal quotation marks, and brackets omitted). The bankruptcy court was well aware of those factors, and declared that the second factor did not cut against the Debtors. It did, however, find manipulation of the bankruptcy proceedings (first factor) and interference with the state proceedings (third factor). Moreover, although it did not specifically mention the egregiousness of the Debtors' behavior, it plainly thought that the behavior was quite troubling at the very least (fourth factor). The BAP agreed with the bankruptcy court's analysis. *See Khan I*, 523 B.R. at 185–87.

The Debtors attack those determinations and concentrate a good deal of their firepower on *Leavitt*'s third factor. *Leavitt*, 171 F.3d at 1224; *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1445 (9th Cir. 1986). They focus on the word "only" and take that to mean that defeating state court litigation had to be the sole motive, but we have not so treated it. For example, in *Leavitt* itself we decided that avoidance was merely the "primary" motive. *Leavitt*, 171 F.3d at 1225; *see also Eisen*, 14 F.3d at 470 (if only intent is to defeat state court litigation, that *is* bad faith); *Chinichian*, 784 F.2d at 1445 (multitude of factors showed bad faith, including the real purpose of the filing). The Debtors do not appear to recognize that the factors are simply factors to consider and that not every one of them must be met. That rather blinds them to the overarching requirement that what matters is "the 'totality of the circumstances.'" *Eisen*, 14 F.3d at 470; *see also Ho v. Dowell (In re Ho)*,

274 B.R. 867, 877 (B.A.P. 9th Cir. 2002) (a court must decide "'in the light of *all* militating factors'"). The BAP recognized that. *See Khan I*, 523 B.R. at 185. As the BAP put it: "Even if a debtor presents more than one purpose for filing, the third *Leavitt* factor does not fail to support cause if the other purpose also reflects bad faith. And, once again, the third factor is considered in a totality of the circumstances context." *Id.* at 186.

We have carefully reviewed the record together with decisions of the bankruptcy court and the BAP, and are satisfied that the evidence fully supports the determinations that there was bad faith and that conversion was appropriate. The highly suspect timing of the Debtors' Chapter 13 petitions, their failure and refusal to provide financial information critical to the determination of the value of their assets, and their further failure to provide information regarding the movement of funds among their various business entities all combined to justify the conversion decision.

Thus, the bankruptcy court did not clearly err or abuse its discretion.

CONCLUSION

This case presents a saga of picaresque behavior. The Debtors converted Barton's stock and were required by the Superior Court to pay substantial damages as a result. In the bankruptcy proceedings, their timing was at least suspicious, and they continued their inappropriate behavior by refusing to be forthcoming about the nature and activities of the business entities they controlled. On this record, the bankruptcy court properly determined that Barton's claims

should not be subordinated and that the Chapter 13 proceedings should be converted to Chapter 7 proceedings. We, therefore, affirm the bankruptcy court.[16]

**AFFIRMED.**  Barton shall recover his costs on appeal.

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the bankruptcy court acted within its discretion when it converted the debtors' bankruptcy proceedings from Chapter 13 to Chapter 7. I also join the majority's conclusion that 11 U.S.C. § 510(b) applies to Debtors who are individuals. However, I dissent from the conclusion of the majority that § 510(b) is inapplicable because the claims of Kenneth Barton did not arise from a purchase or sale of securities. In my view, the opposite conclusion is inescapable–that Barton's claim *did* arise from the purchase or sale of a security under § 510(b).

It is undisputed that Barton purchased securities in RPost International, Ltd. It is also undisputed that Debtors impermissibly converted Barton's stock. However, that conversion did not erase the fact that Barton's subsequent claims against Debtors arose from his previous purchase of securities.

The majority acknowledges that we have consistently interpreted the phrase "arising from" broadly. *Majority*

---

[16] Of course, in so doing we have rejected the reasoning of the BAP on the subordination issue.

*Opinion*, p. 12–12. We most recently reiterated that interpretation in *Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, 834 F.3d 1003, 1009 (9th Cir. 2016) ("[W]e observe that § 510(b)'s arising from language reaches broadly to subordinate damage claims involving qualifying securities.") (citation and internal quotation marks omitted). We went on to explicate that the "arising from" phraseology is "broader than causation" and is "ordinarily understood to mean 'originating from,' 'having its origin in' 'growing out of,' or 'flowing from' or in short, 'incident to or having connection with.'" *Id*. (citation omitted).

We rejected the creditor's contention that his claims did not arise from the purchase or sale of securities because the claimant was indisputably an investor in the debtor's affiliate. *See id*. at 1008–09. Rather, we continued to adhere to "one of the general principles of corporate and bankruptcy law" embodied within the text of § 510(b): "that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *Id*. at 1008 (quoting *Racusin v. American Wagering Inc*. (*In re American Wagering*), 493 F.3d 1067, 1071 (9th Cir. 2007)).

In *Del Biaggio*, we cited our precedent concluding that a claimant was a shareholder even though the debtor's defalcation "converted the claimant's interest from an equity interest to a debt interest before the bankruptcy filing." *Id*. at 1009 (quoting *Pensco Trust Co. v. Tristar Esperanza Properties, LLC* (*In re Tristar Esperanza Properties, LLC*), 782 F.3d 492, 497–98 (9th Cir. 2015)).

We also referenced *American Broadcasting Sys. v. Nugent* (*In re Betacom of Phoenix, Inc*.), 240 F.3d 823, 830 (9th Cir. 2001), as an example of our broad interpretation of

§ 510(b). *See id*. We explained that we applied § 510(b) to a damages claim predicated on a "purported breach of contract in a merger agreement" because the claim was "one 'surrounding' the sale or purchase of a security of the debtor." *Id*. (quoting *In re Betacom*, 240 F.3d at 829).

In addition, we noted that our broad interpretation of the "arising from" language of § 510(b) is consistent with the interpretations advanced by our sister circuits. *See id*. (referencing *Templeton v. O'Cheskey* (*In re Am. Hous. Found*.), 785 F.3d 143 (5th Cir. 2015); *SeaQuest Diving, LP v. S&J Diving, Inc.* (*In re SeaQuest Diving, LP*), 579 F.3d 411, 421–22 (5th Cir. 2009); *Rombro v. Dufrayne* (*In re Med Diversified, Inc*.), 461 F.3d 251, 254–55 (2d Cir. 2006)).

The majority also cites our precedent and does not attempt to distinguish it, other than to try to fit the facts of this case within the confines of our decision in *American Wagering*. *See Majority Opinion*, p. 12–13. However, the fit is cramped and imperfect. Preliminarily, in *Del Biaggio*, we described our decision in *American Wagering* as requiring subordination "where there exists *some nexus or causal relationship* between the claim and the purchase of the securities." *Del Biaggio*, 834 F.3d at 1009 (citation and internal quotation marks omitted) (emphasis added). We explained that the facts in *American Wagering* did not fall within our broad interpretation because, and only because, the claimant's contract with the debtor was explicitly *not* for the purchase or sale of securities. *See id*. Rather, the contract was explicitly for services as a financial advisor. The resulting agreement stated:

> Should [the creditor] bring in a buyer . . . said company will be paid a commission based on 5% of the purchase price.

*In re Am. Wagering*, 493 F.3d at 1069.

Seven months later, another agreement was entered into between the same parties, with the following provision:

> [Claimant] has been our financial advisor for the purpose of an initial public offering . . . As compensation he would be paid 4 ½% of the final evaluation in the form of . . . common stock and $150,000 cash.

*Id*. at 1070.

After two years, the debtor filed an action against the creditor seeking to invalidate the contract in its entirety. *See id*. Following a jury trial, a verdict was rendered in favor of the creditor for "stock . . . in an amount equal to 4.5% of $45,000,000 [the final valuation of the common stock] and $150,000 in cash." *Id*. Consistent with this verdict, the court awarded the creditor 337,500 shares of stock worth $2.025 million. *See id*.

The creditor appealed the award, arguing that it was error for the court to award specific performance by way of bestowing stock, when the creditor requested money damages. *See id*. We agreed and remanded for the court to calculate the monetary equivalent of the 337,500 shares. *See Leroy's Horse and Sports Place v. Racusin*, 21 Fed. Appx. 716, 717–18 (9th Cir. 2001). On remand, the creditor was awarded monetary damages of $2,310,000–$150,000 cash

plus $2,160,000 (the value of the stock as of the date when the creditor could have sold his shares). *See American Wagering*, 493 F.3d at 1070.

Shortly after the damages award, the debtor filed for Chapter 11 bankruptcy protection, and sought to subordinate the creditor's claim pursuant to § 510(b). *See id.*

As we observed in *Del Biaggio*, the creditor in *American Wagering* never sought "to recover an investment loss." *Del Biaggio*, 834 F.3d at 1009. Rather, the creditor's "contract with the debtor merely used stock value as a basis for calculating compensation." *Id.* We clarified in *American Wagering* that the creditor "received a money judgment for services rendered." 493 F.3d at 1073. We referenced "[o]ur earlier decision" reversing the award of stock to the creditor as making it clear that the creditor's "underlying claim [was] a debt claim, not an equity claim." *Id.* The creditor "did not sue debtors as an equity investor seeking monetary damages for fraud . . . related to their mishandling of shareholders' economic investment." *Id.* Instead, the creditor brought his action as an individual who was not compensated as provided in an employment agreement. *See id.*

In contrast, Barton initially brought his action in state court specifically describing himself as a shareholder who had been wrongfully deprived of his shares by the debtors. In his Third Amended Complaint, Barton asserted that he was issued 6,016,500 shares of RPost International Limited Stock, that Defendants owed. Barton alleged that he was "a shareholder," owed a fiduciary duty of disclosure, and Defendants wrongfully converted Barton's shares of stock, causing Barton to suffer damages "[a]s a direct, proximate, and foreseeable result of the taking and conversion of

Barton's shares . . ." *Third Amended Complaint*, *Barton v. RPost International Ltd*, Case No. YC061581, Superior Court of the State of California for the County of Los Angeles-Southwest District, February 16, 2011, pp. 5–9.

Consistent with Barton's allegations focusing exclusively on the conversion of his shares, the Superior Court judge continued in the same vein. Indeed, the decision of the state court judge leaves no doubt about the genesis of Barton's claims. The state court "issue[d] a declaration that Plaintiff Barton was at all relevant times an owner of 6,016,500 common shares . . . and that he provided appropriate consideration for said shares of stock. . . ." *Statement of Decision*, *Barton v. RPost International Ltd*., Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, August 3, 2012, p. 5. The state court prohibited RPost International "from taking any action to encumber, forfeit, and/or cancel Barton's shares without having obtained prior written approval from either the court, Barton or his duly authorized counsel." *Id*.

The court ordered Defendants to restore the shares of stock to Barton. *See id*., p. 8. Leaving no doubt that the remedy was intended to restore Barton to the position of shareholder, the state court ordered that Barton "have no role in the management of the company but . . . be given reasonable notice of meetings of its shareholders and major transactions." *Id*. The state court "encouraged [the parties] to meet and confer to determine, *on their own*, a purchase price for Barton's shares of stock so that a potentially uncomfortable relationship going forward can be avoided." *Id*. (emphasis added).

The state court's order unequivocally restored Barton to his status as a shareholder in RPost International. Unlike the creditor in *American Wagering*, the record nowhere reflects that Barton objected to the remedy of specific performance. It was only after the punitive damages phase of the trial that the state court awarded the monetary value of the stock to Barton. *See Ruling on Punitive Damages and Revisions to Statement of Decision, Barton v. RPost International Ltd.*, Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, June 18, 2013, pp. 1–2. Nevertheless, the state court continued to link its damages award to the conversion of Barton's shares. *See id.*, p. 2. The court explained that because "the assets and character of RPost International had changed dramatically . . . returning the 6,016,500 shares to Mr. Barton would undoubtedly spark an endless round of post-judgment motions and additional lawsuits." *Id.* However, the court never strayed from its conclusion that Mr. Barton was entitled to this remedy as a shareholder of RPost International. *See id.*

The facts of this case are not even close to those we considered in *American Wagering*. In that case, the creditor was never a shareholder of the debtor and never sought or accepted specific performance by way of the award of shares. *See Am. Wagering*, 493 F.3d at 1069–70. The plaintiff in that case steadfastly based his claim on an employment contact that was simply measured by the price of the stock. *See id.* at 1071 (noting that the original contract "only gave [the creditor] the monetary value of the shares of stock, not the stock itself"). Notably, the plaintiff in *American Wagering* actually appealed the district court's decision awarding stock as a remedy. *See id.* at 1070. In contrast, Barton predicated his entire complaint on his status as a shareholder. No other

basis for recovery was ever articulated, and Barton posed no objection when the state court awarded him shares and shareholder rights as a remedy. At bottom, Barton's claim is closer to the facts of *Del Biaggio*, where we characterized the damages claim in a similar fraudulent scheme resulting in the loss of equity shares as "clearly one arising from the sale or purchase of securities." 834 F.3d at 1009. As in *Del Biaggio*, the damages sought by Barton and awarded by the state court "correspond exactly to the amount [Barton] invested in [RPost International] through his initial purchase of [RPost International] securities . . ." *Id*. As in *Del Biaggio*, "[Barton's claim is really no claim at all but for his investment in [RPost International]. *Id*.

Similar to the majority's approach, the creditor in *Del Biaggio* sought to "analogiz[e] his case to the facts *of American Wagering*." *Id*. We rejected the proposed analogy because the creditor in *Del Biaggio*, like Barton, sought to "recover an investment loss," *id*., rather than "valu[ing] a free-standing injury by reference to a security." *Id*. at 1009–10. As in *Del Biaggio*, without a separate source of injury unrelated to his security holdings, Barton's "asserted injury is inseparable from his [RPost International] investment." *Id*. at 1010.

The majority also relies upon the decision of a bankruptcy court, *In re Angeles Corp*., 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) that was summarily affirmed by the Bankruptcy Appellate Panel. *See* 199 B.R. 220 (B.A.P. 9th Cir. 1996).

The discussion section of *Angeles* is light on the underlying facts. The court noted only that "it appears that approximately $250 million of money invested by limited partners was lost from inception of the partnerships to the

present." *Angeles*, 177 B.R. at 924. Addressing the subordination question, the court ruled that "claims alleging misconduct, breach of fiduciary duty, or wrongful acts by Debtor . . . in managing the partnerships *subsequent* to the purchase of the limited partnership interests are *not* . . . subject to subordination . . ." *Id*. at 926 (emphases in the original).

This interpretation ignores the broad language of § 510. *See Weissman v. Pre-Press Graphics Co., Inc*. (*In re Pre-Press Graphics Co., Inc*., 307 B.R. 65, 76 (N.D. Ill. 2014) (describing *Angeles* as "supporting the narrow approach" to interpreting § 510). It is also directly contrary to more recent precedent. *See SeaQuest Diving*, 579 F.3d at 418 (involving rescission of creditor's equity investment *subsequent* to the purchase); *Tristar Esperanza Prop*., 782 F.3d at 497 (explicitly rejecting the argument that the subsequent nature of the claim dictates the outcome); *Del Biaggio*, 834 F.3d at 1007 (addressing a subsequent fraud claim stemming from an equity investment).

In the twenty-plus years that *Angeles* has been in existence, the case has been widely and roundly criticized. In the case of *In re Enron Corp*., 341 B.R. 141, 154 (Bankr. S.D.N.Y. 2006), the bankruptcy court questioned whether *Angeles* "can still be considered good law" in view of "the recent trend in the case law." The court described *Angeles* as "embrac[ing a] restricted reading of section 510(b)" that had been "uniformly rejected" in more recent cases, and observed that these more recent cases "explicitly disagree[ ] with the legal principles" espoused in *In re Angeles*. *Id*. The bankruptcy court expressly referenced our decision in *Betacom*, noting that the holding in *Betacom* "eviscerates the logic of *Angeles* even if the *Betacom* court did not address

[*Angeles*] directly. *Id*. at 155 (citation omitted); *see also Frankum v. Int'l Wireless Comm. Hldgs, Inc*. (*In re Int'l Wireless*), 279 B.R. 463, 469 n.2 (D. Del. 2002) ("[T]he validity of . . . *Angeles* in this circuit is suspect . . . Accordingly, the Court declines to adopt the rationale[ ] of [*Angeles*.]"); *In re Pre-Press Graphics*, 307 B.R. at 77–78 (declaring *Angeles* "not . . . persuasive" and undermined by more recent precedent from the Ninth Circuit); *Id*. at 76 ("The statutory interpretation set forth in [*Angeles*] . . . has been called into doubt by recent decisions from the Third, *Ninth* and Tenth Circuits.") (emphasis added); *In re Granite Partners*, 208 B.R. 332, 342–43 (Bankr. S.D.N.Y. 1997) (characterizing *In re Angeles* as "not persuasive").

Finally, but not incidentally, I disagree with the majority's conclusion that Barton should not be included within the category of investors who assumed the risk of investment loss. As a shareholder, Barton was the quintessential investor whose fortune was tied to the ups and downs of his investment, including those linked to fraud. *See Del Biaggio*, 834 F.3d at 1011 ("As an investor, [the creditor] bargained for increased risk in exchange for an expectation in the profits . . ." "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud . . . to bootstrap their way to parity with general unsecured creditors . . .") (citation and footnote reference omitted). Unfortunately, Barton is not exempt.

In sum, considering the broad language of § 510(b) and the correspondingly broad interpretation we have consistently applied in our precedent, Barton, a shareholder in the debtor corporation, asserted conversion claims arising from the purchase of his shares. Without a doubt, his claim stemmed directly from the wrongful appropriation of the very shares he

purchased. *See Del Biaggio*, 834 F.3d at 1009. I respectfully dissent from the majority's contrary conclusion which, in my view, contravenes circuit precedent and the policy underlying § 510(b).